IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| JUDY C. CARPENTER, | § | |
| PLAINTIFF, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 4:06-CV-414-A |
| | § | |
| MICHAEL J. ASTRUE, | § | |
| COMMISSIONER OF SOCIAL SECURITY, | § | |
| DEFENDANT. | § | |

<u>FINDINGS, CONCLUSIONS AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE
AND
NOTICE AND ORDER</u>

This case was referred to the United States Magistrate Judge pursuant to the provisions of Title 28, United States Code, Section 636(b). The Findings, Conclusions and Recommendation of the United States Magistrate Judge are as follows:

<u>FINDINGS AND CONCLUSIONS</u>

A.  STATEMENT OF THE CASE

Plaintiff Judy C. Carpenter brings this action pursuant to Section 405(g) of the Social Security Act, Title 42 of the United States Code, for judicial review of a final decision of the Commissioner of Social Security denying her claim for disability insurance benefits under Title II of the Social Security Act. Carpenter applied for disability insurance benefits on April 28, 2003, claiming that her disability commenced August 30, 2000. (Tr. 68). She met the insured status requirements at all times relevant to the administrative decision. After the Social Security Administration denied her application for benefits both initially and on reconsideration, Carpenter requested a hearing before an administrative law judge (the "ALJ"). ALJ Ward D. King held a

hearing on June 27, 2005, in Fort Worth, Texas. (Tr. 499). Carpenter was represented by counsel. On July 28, 2005, the ALJ issued a decision that Carpenter was not disabled because she had the residual functional capacity (RFC). (Tr.16-25). The Appeals Council denied Carpenter's request for review, leaving the ALJ's decision to stand as the final decision of the Commissioner. (Tr. 6).

B. STANDARD OF REVIEW

The Social Security Act defines a disability as a medically determinable physical or mental impairment lasting at least twelve months that prevents the claimant from engaging in substantial gainful activity. 42 U.S.C. § 423(d)(1)(A); *McQueen v. Apfel*, 168 F.3d 152, 154 (5th Cir. 1999). To determine whether a claimant is disabled, and thus entitled to disability benefits, a five-step analysis is employed. 20 C.F.R. § 404.1520. First, the claimant must not be presently working at any substantial gainful activity. Substantial gainful activity is defined as work activity involving the use of significant physical or mental abilities for pay or profit. 20 C.F.R. § 404.1527. Second, the claimant must have an impairment or combination of impairments that is severe. 20 C.F.R. § 404.1520(c). At the third step, disability will be found if the impairment or combination of impairments meets or equals an impairment listed in the appendix to the regulations. *Id.* § 404.1520(d). Fourth, if disability cannot be found on the basis of a listing alone, the impairment or impairments must prevent the claimant from returning to his past relevant work. *Id.* § 404.1520(e). And fifth, the impairment must prevent the claimant from doing any work, considering the claimant's residual functional capacity, age, education, and past work experience. *Id.* § 404.1520(f); *Crowley v. Apfel,* 197 F.3d 194, 197-98 (5th Cir.1999).

At steps one through four, the burden of proof rests upon the claimant to show he is disabled.

If the claimant satisfies this responsibility, the burden shifts to the Commissioner at step five of the process to show that there is other gainful employment the claimant is capable of performing in spite of his existing impairments. *Crowley*, 197 F.3d at 198. A finding at any point in the five-step process that a claimant is disabled or not disabled is conclusive and terminates the analysis. *Masterson v. Barnhart*, 309 F.3d 267, 272 (5th Cir. 2002).

A denial of disability benefits is reviewed only to determine whether the Commissioner applied the correct legal standards and whether the decision is supported by substantial evidence in the record as a whole. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995); *Hollis v. Bowen*, 837 F.2d 1378, 1382 (5th Cir. 1988). Substantial evidence is such relevant evidence as a responsible mind might accept to support a conclusion. *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001). It is more than a mere scintilla, but less than a preponderance. *Id*. A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings support the decision. *Id.* Conflicts in the evidence are for the Commissioner and not the court to resolve. *Masterson*, 309 F.3d at 272. The court will not re-weigh the evidence, try the questions *de novo,* or substitute its judgment for the Commissioner's, even if the court believes the evidence weighs against the Commissioner's decision. *Id.*; *Harris v. Apfel*, 209 F.3d 413, 417 (5th Cir.2000); *Hollis*, 837 F.2d at 1383.

C. ISSUES

Whether the ALJ's assessment of Carpenter's physical and mental residual functional capacity is supported by substantial evidence.

D.  ADMINISTRATIVE RECORD

   1.   Medical History

The administrative transcript includes the following information about Carpenter's physical and mental impairments:

Carpenter sustained a work-related back injury in 1997, (Tr. 138), but she continued working until August 2000. In March 2002, Carpenter saw her primary care physician, Georgia Allen, M.D., for complaints of exacerbation of her back pain. (Tr. 251-52). Allen prescribed steroids, and ordered a lumbar magnetic resonance imaging (MRI) scan. The MRI showed a mildly bulging lumbar disc at L5-S1 with mild underlying disc dessication, but no focal disc herniation or spinal canal stenosis was observed. (Tr. 249-50). Another MRI showed mild degenerative changes of the cervical spine and moderately severe degenerative changes along the dorsal spine with anterior and lateral spurring. (Tr. 238). Allen referred Carpenter to anesthesiologist David Findlay, M.D., for pain management. (Tr. 229).

Findlay evaluated Carpenter on May 30, 2002. (Tr. 233). Carpenter reported lower extremity pain with numbness and tingling that had persisted for several years, with recent acute exacerbation of her symptoms. She also complained of difficulty sleeping, which contributed to her anxiety and depression. (Tr. 233). On examination, Carpenter had difficulty sitting down or walking, and she walked in a bent-over fashion. Findlay observed no significant neurological changes, and Carpenter's gross sensory abilities were intact. Her low back and sacrum were tender and painful, and Carpenter also exhibited some sacroiliac tenderness. (Tr. 234). Findlay assessed

chronic low back pain; coccydynia;[1] possible sacroiliac arthropathy;[2] degenerative joint disease at L5-S1 with bilateral radiculopathy;[3] and probable discogenic pain.[4] He recommended lumbar epidural injections and prescription medications to address her symptoms. (Tr. 234).

Findlay administered a series of steroid and trigger-point injections, which provided Carpenter with only temporary and partial relief. (Tr. 199, 206-32, 235-36). Carpenter complained of constant pain along her buttocks and sacral area, and rated her pain as a two on a scale of ten with pain. On rare occasions, her pain level was four or five. (Tr. 199). On examination in February 2003, Carpenter was fidgety and irritable. (Tr. 199). She exhibited mild tenderness in her back and sacral area. Straight leg raising was negative bilaterally, and she had good range of motion in her extremities. Her motor strength was 5/5, with no gross sensory abnormalities to touch or pinprick and intact reflexes. Findlay assessed nondescript low back pain, worse with sitting, with probable discogenic pain. (Tr. 200). Findlay prescribed new pain management medications.

In March 2003, Carpenter reported doing much better and had no complaints about the medications she was taking. Her pain was under control except for periodic pain in her right hip, and she was able to perform activities of daily living quite well. (Tr. 191). She also had rare episodes of right lower extremity radicular-type pain, but these episodes, which had occurred twice since her last visit, had resolved spontaneously. She rated her pain as a one or two on a scale of ten.

---

[1] Coccydynia refers to pain in the coccyx and surrounding area. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 370 (29th ed. 2000).

[2] Arthropathy refers to any joint disease. *Id*. at 152.

[3] Radiculopathy is a disease of the nerve roots. *Id.* at 1511.

[4] Discogenic pain refers to pain caused by derangement of an intervertebral disk. *Id*. at 510.

(Tr. 191). Carpenter was tender to palpitation, but demonstrated full range of motion and motor strength. No focal or sensory deficits were noted. (Tr. 191).

As part of the disability application process, Carpenter underwent a mental status evaluation on July 8, 2003, with psychologist Mimi Wright. (Tr .319). Carpenter was in noticeable pain during the interview and had difficulty remaining comfortable during the session. Her chief complaint was back pain so severe as to make her feel suicidal. Treatment with medication and physical therapy had not produced significant improvement, and she complained of depression and difficulty sleeping as a result. She also described several acute episodes that she feared were heart-related, but emergency room staff had diagnosed the episodes as panic attacks. The medications she was taking included a mood stabilizer, an antidepressant, anti-anxiety medication, muscle relaxants, and anti-inflammatories. (Tr. 320).

Carpenter reported that her daily activities were limited by pain. She had difficulty with household chores that required standing or lifting, and grocery shopping caused stabbing pains in her hip and leg. (Tr. 320). She tried to walk each day for exercise and found it relaxing to sit outside. She also watched a great deal of television and read about history. She used to participate in historical re-enactments, but had to reduce her level of participation after her injury. Carpenter did not watch the news because it was depressing. She was able to drive when necessary. (Tr. 320). Carpenter did not have friends with whom she socialized regularly, but often visited with her son who lived nearby. Her stepdaughter would come over frequently to assist her with housecleaning and shopping. Wright noted no previous episodes of decompensation, and noted that Carpenter was able to complete the testing efficiently.

Carpenter was cooperative during the interview, but appeared to be tired and sad. She

expressed herself well, and there was no evidence of loose associations or tangential thinking. Carpenter was able to think abstractly and demonstrated good insight into her situation. (Tr. 321). She had no unusual preoccupations or ideations. Wright described Carpenter's mood as "grim," and Carpenter expressed little hope for the future, although she also reported that recent treatment had produced some improvement in her condition. (Tr. 322). Carpenter appeared to be of average to above-average intelligence. She was able to repeat six digits forward and five digits backward. She solved simple arithmetic problems, and she was able to perform serial 3s, 4s, and 7s. Her judgment was assessed as good. (Tr. 322). Wright diagnosed an adjustment reaction with mixed anxiety and a depressed mood. Wright also assessed a current Global Assessment of Functioning (GAF) score of 55.[5] Carpenter's prognosis was guarded because of her pain and persistent feelings of hopelessness. (Tr. 323).

Carpenter also saw neurologist Jacob Rosenstein, M.D., for assessment of her back and lower extremity pain. (Tr. 258-72). Carpenter was tender to palpation, but gait, heel, and toe walking were normal. The range of motion in her lumbar spine included flexion to forty-five degrees, extension of fifteen degrees (producing pain), and lateral bending of twenty degrees to the left and right. Straight leg raising was positive at seventy degrees, producing pain in her low back and right buttock. (Tr. 259). She had 5/5 motor strength in her lower extremities, and her sensory examination was intact. A lumbar MRI showed degenerative changes and a broad-based disc protrusion at L5-S1 that did not impinge on any neural structure. (Tr. 267). Rosenstein diagnosed

---

[5] A GAF score is a standard measurement of an individual's overall functioning level "with respect only to psychological, social, and occupational functioning." AMERICAN PSYCHIATRIC ASS'N DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS at 32 (4th ed. 1994)(DSM-IV). *See Boyd v. Apfel*, 239 F.3d 698, 700 n.2 (5th Cir. 2001). A GAF score of 51 to 60 reflects moderate symptoms or moderate impairment in functioning. DSM-IV at 34.

lumbar facet syndrome and recommended lumbar facet injections at L3-L4, L4-L5, and L5-S1. (Tr. 260, 261).

A MRI of Carpenter's thoracic spine in July 2003 showed disc protrusions at T4-T5 and T6-T7 that contacted the ventral cord. (Tr. 264). A discogram in July 2003 showed essentially normal discs at L4-L5 and L5-S1 without evidence of a disc protrusion or herniation. (Tr. 176). A computed tomography (CT) scan of the L4-L5 and L5-S1 disc spaces was also interpreted as normal. (Tr. 177). During a follow-up visit with Findlay in July 2003, Carpenter complained of radicular leg pain, which was aggravated by bending, sitting, or other activity. Rest, sleeping, and standing alleviated her symptoms. (Tr .313). Her gait was mildly antalgic, with a restricted range of motion secondary to pain. Motor and sensory examinations were normal. (Tr. 314). In August 2003, Findlay performed an ablation at the L5-S1 disc, resulting in a reported 50% improvement in Carpenter's symptoms. (Tr. 159-69, 300, 308). In November 2003, Carpenter had an epidural lysis of adhesions at the left L5 nerve root to relieve refractory bilateral lower extremity radiculopathy. (Tr .151-57). She complained of radicular pain on the outer side of her leg that was triggered by moving her back. (Tr. 296, 300). Her gait was normal with normal range of motion along her cervical, thoracic, and lumbar spine. Carpenter was tender to palpation of her thoracic and lumbar spine. Straight-leg raising was negative, and a motor examination was normal. (Tr. 297). Carpenter underwent an occipital nerve block in February 2004 to relieve her headache pain. (Tr. 292). Additional trigger point injections were administered in early 2004, and in June 2004, Carpenter underwent sacral radiofrequency neurolysis.[6] (Tr. 281, 283-91). During a follow-up visit in October

---

[6] Neurolysis refers to destruction or dissolution of nerve tissue, which is a temporary or permanent measure for relieving pain or spasticity. DORLAND'S at 1210.

2004, Carpenter reported that she had experienced an overall 50% improvement in her pain level as a result of Findlay's treatment. (Tr. 405). Additional nerve blocks, epidural steroid injections, and trigger point injections were administered in October and November 2004 and early 2005, and Carpenter underwent radiofrequency neurolysis of the nerves at L4-L5 and L5-S1 in December 2004. (Tr. 435, 441-48, 474, ).

The medical records also reflect Carpenter's complaints of chronic headaches. Her primary care physician ordered a brain MRI and referred her to a neurologist for evaluation. Neurologist William McIntosh examined Carpenter in January 2004. (Tr. 377-79). He noted that the MRI had shown a vascular malformation in the left hemisphere of her brain, (Tr. 148), but he opined that this finding was incidental and asymptomatic. (Tr. 379). McIntosh also elicited a psychiatric history from Carpenter. Carpenter reported that she was raped as a teenager and was a victim of physical and sexual abuse during three previous marriages. She had been married to her current husband for twenty years. (Tr. 378). McIntosh performed a neurological examination, which was essentially normal, but he noted that Carpenter grimaced with almost any activity. (Tr. 378). McIntosh opined that Carpenter likely had significant psychiatric issues as a result of her traumatic history and recommended that she seek counseling. (Tr. 379).

Carpenter began seeing psychiatrist Maryrita Mallet, M.D., in December 2003. (Tr. 369). Carpenter admitted having suicidal thoughts, insomnia, and feelings of hopelessness, helplessness, and worthlessness. She was tearful, depressed, and anxious during the intake mental status examination. (Tr. 369). Mallet diagnosed major depressive disorder and chronic pain disorder, with a possible post traumatic stress disorder or avoidant disorder. Mallet assessed a current GAF score

of 45, reflecting serious symptoms.[7] (Tr. 373). Carpenter saw Mallet routinely through 2005. (Tr. 382-90, 421-29, 454-59).

Mallet completed a written assessment of Carpenter's ability to perform work-related mental activities in January 2005. (Tr. 161-62). Mallet opined that Carpenter had a fair ability to follow work rules; interact appropriately with supervisors, co-workers, and the public; use judgment; understand, remember and carry-out simple job instructions; and maintain personal appearance. Carpenter's ability to deal with work stresses; function independently; maintain attention and concentration; understand, remember and carry-out detailed or complex job instructions; behave in an emotionally stable manner; react predictably in social situations; and demonstrate reliability in work practices (including attendance) was assessed as poor. (Tr. 161-61). Mallet opined that Carpenter would miss work frequently for both medical and mental reasons. Mallet based her opinion on Carpenter's pain behaviors, poor eye contact, decreased attention and focus, somatic focus, poor sleep, chronic depression and suicidal thoughts, and chronic pain. (Tr. 162).

2. Administrative Hearing

Carpenter testified that she was born April 21, 1954. (Tr. 506). She completed the tenth grade, and before August 2000, she had worked as a convenience store manager and cashier. She also testified that she worked on a part-time basis, one or two days a week, from May 2001 to May 2003. (Tr. 508-09).

Carpenter testified that she has low back pain that radiates into her hips, groin, and legs. (Tr. 512). She uses a cane for walking because of weakness in her legs, but also testified that her pain

---

[7]. A GAF score of 41-50 reflects serious symptoms or any serious impairment in social, occupational or school functioning. DSM-IV at 34.

and mobility have improved since she began seeing Findlay. (Tr. 513). Every four to six months Findlay repeats a procedure to "burn" the nerves in her back, and he administers pain-relief injections during the intervening office visits. Carpenter testified that she also uses oxycodone for pain relief, which dulls the pain, but she is never pain-free. She reported that her medications make her sleepy and affect her memory. (Tr. 514).

In addition to her back pain, Carpenter testified that she suffers from headaches that make her vomit. She testified that her headaches can last for six to eight weeks. She uses medication, ice packs, and rest to relieve her headaches. (Tr. 515).

Carpenter continued to see a psychiatrist for treatment of her depression, but still had good days and bad days. (Tr. 517). She testified that she sometimes felt hopeless and panicky and had difficulty interacting with her family. Her family would avoid her during these periods. (Tr. 517-18). Carpenter spent most of the day watching television, listening to music, and reading the Bible. She stated that pain and depression prevented her from working on a full-time basis. (Tr. 518).

Vocational expert Shelly Eike also testified. The ALJ asked Eike to consider the following hypothetical individual:

> Assume an individual who is 51 years of age with a 10th grade education and the same work history as Ms. Carpenter. Assume the individual can perform a full range of light work but with these limitations, only occasional stooping, crouching and climbing ladders or scaffolds. The individual is limited to jobs with a reason and development level of one through three as defined in the Dictionary of Occupational Titles; and finally, no extensive and involved public contact. By that I mean for example, no job involving negotiating skills, selling or resolving customer complaints. Assume further that the individual cannot do any of Ms. Carpenter's past relevant work. In your opinion are there jobs existing in significant numbers in the national economy that such a person could perform?

(Tr. 525). Eike responded affirmatively, and identified unskilled work as a sales attendant (with

-11-

14,000 jobs in Texas and 180,000 jobs nationwide); small product assembler (with 20,000 jobs in Texas and 160,000 jobs nationwide); and small cart inspector (with 9,800 jobs in Texas and 139,000 jobs nationwide). Eike testified that there were no conflicts between her testimony and the jobs as described in the Dictionary of Occupational Titles. (Tr. 526). None of the jobs she had identified would utilize transferable work skills. (Tr. 527).

3.  ALJ Determination

In addressing the first two steps of the sequential evaluation process, the ALJ found that Carpenter's part-time work after her alleged onset date did not constitute substantial gainful activity, and he further found that she had a severe combination of impairments that included mild degenerative changes along her cervical, thoracic, and lumbar spine; headaches; right carpal tunnel syndrome; and an adjustment reaction disorder with mixed anxious and depressed mood. (Tr. 17). The ALJ, however, found that Carpenter had no impairment or combination of impairments that met or equaled the severity of a listed impairment for purposes of a disability finding at step three of the sequential evaluation process. Instead, he found that Carpenter retained the residual functional capacity for light work[8] that did not require more than occasional stooping, crouching, and climbing of ladders and scaffolds; was limited to tasks with a reasoning development level of one, two, or three (as defined in the Dictionary of Occupational Titles);[9] and did not involve extensive or

---

[8] Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. 20 C.F.R. § 404.1567(b).

[9] "Level 3" reasoning skills require commonsense understanding to carry out instructions furnished in a written, oral, or diagrammatic form and deal with problems involving several concrete variable in or from standardized situations. *See* DICTIONARY OF OCCUPATIONAL TITLES app. C (rev. 4th ed. 1991)(Scale of General Education Development). "Level 2" reasoning skills require the employee to apply commonsense understanding to execute detailed but uninvolved instructions and deal with problems involving a few concrete variables in or from

involved public contact. (Tr. 23). The ALJ found at the fourth step of the sequential evaluation process that Carpenter could not return to her past relevant work because it exceeded her current work-related limitations, but based on the vocational expert's testimony and the Medical-Vocational Guidelines, the ALJ found that there were a significant number of other jobs available in the national and local economies that Carpenter could perform. The ALJ concluded that Carpenter was not disabled and was not entitled to disability insurance benefits. (Tr. 24-25).

4. Evidence Submitted to Appeals Council

Findlay completed a medical source statement dated July 8, 2005, which Carpenter supplied to the Appeals Council in support of her request for review. (Tr. 481). In his statement, Findlay opined that Carpenter could stand and/or walk for fifteen minutes at a time for a total of less than one hour during an eight-hour workday, and could sit for fifteen minutes at a time for a total of less than one hour during an eight-hour workday. He also opined that Carpenter would need to rest by lying down for more than four hours during the workday. He found Carpenter capable of lifting up to ten pounds occasionally, and he indicated that she could reach overhead, reach forward, handle objects, and finger objects on an occasional basis. (Tr. 482). Findlay asserted that Carpenter's condition, with the above restrictions, had persisted since at least August 2000. (Tr. 482).

---

standardized situations. *See id.*. "Level 1" reasoning skills require the application of commonsense understanding to carry out simple one- or two-step instructions and dealing with standardized situation with occasional or no variable in situations encountered on the job. *See id.*

E.  DISCUSSION

   1.  Physical RFC

Carpenter contends that new and material evidence submitted to the Appeals Council renders the ALJ's physical RFC assessment unsupported by substantial evidence. Carpenter notes that Findlay's medical source statement restricts her to sedentary work at most, which contradicts the ALJ's determination that she is capable of performing light work. She also notes that, if limited to sedentary work, she would be considered disabled according to the Medical-Vocational Guidelines upon reaching her fiftieth birthday in 2004 in light of her limited education and lack of transferable work skills. 20 C.F.R. Part 404, Subpart P, app. 2, Table No. 1, § 201.10.

The regulations provide a claimant with the opportunity to forward new and material evidence to the Appeals Council for consideration in deciding whether to grant a request for review of an ALJ's decision. *See* 20 C.F.R. § 404.970(b). Evidence submitted for the first time to the Appeals Council is considered part of the record upon which the Commissioner's decision complained of is based. *See Higginbotham v. Barnhart*, 405 F.3d 332, 337 (5th Cir. 2005).

Carpenter submitted Findlay's report to the Appeals Council, but the Appeals Council found that the additional evidence provided no basis for changing the ALJ's decision.[10] The court's role is to consider the administrative record as a whole, which includes the additional evidence submitted to the Appeals Council, in deciding if the final decision of the Commissioner is supported by

---

[10] The Fifth Circuit has rejected arguments that the Appeals Council is required to provide a detailed explanation of the weight given to newly submitted evidence. *Higginbotham*, 405 F.3d at 335 n.1; *Jones v. Astrue*, 2007 WL 1017095 at *3 (5th Cir. Mar. 29, 2007). Although the Hearings, Appeals and Litigation Law Manual ("HALLEX") provides that the Appeals Council will specifically address additional evidence or legal arguments submitted to it in connection with a request for review, that requirement has been suspended since 1995. *See* HEARINGS, APPEALS AND LITIGATION LAW MANUAL at I-3-5-1, I-3-5-20, and I-3-5-90.

substantial evidence. *See id*. at 337.

Medical opinions, diagnoses, and evidence of a treating physician who is familiar with the claimant's impairments, treatments and responses, are generally given great weight in determining disability. *See Leggett v. Chater*, 67 F.3d 558, 566 (5th Cir. 1995); *Greenspan v. Shalala*, 38 F.3d 232, 237 (5th Cir. 1994). The Commissioner assigns controlling weight to the opinion of a treating physician if well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence in the record. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); *Martinez v. Chater*, 64 F.3d 172, 176 (5th Cir. 1995). Even if a treating source opinion is not entitled to controlling weight under the regulations, that does not mean the opinion should be wholly rejected. Such opinions are still entitled to deference and are weighed using the factors outlined in the regulations, including the length of the treatment relationship, frequency of examination, nature and extent of the treating relationship, evidence supporting the opinions, the consistency of those opinions, and medical specialization. *See* 20 C.F.R. §§ 404.1527(d), 416.927(d); *Newton v. Apfel*, 209 F.3d 448, 456 (5th Cir. 2000). *See also* SOCIAL SECURITY RULING 96-2p, 96-5p.

Findlay is a specialist in pain management, and treated Carpenter for several years and examined her on numerous occasions. In his medical source statement, he outlined restrictions in her abilities to sit, stand, walk, and lift that are at odds with the ALJ's assessment of the same work-related physical activities, and there are no other firsthand medical opinions in the record that address these same areas of functioning. Nonetheless, unpublished Fifth Circuit cases issued in the wake of *Higginbotham* suggest that the courts should avoid remanding cases based on evidence newly submitted to the Appeals Council without meaningful regard for the substantial evidence

standard, even when the newly submitted evidence consists of a treating source opinion. *Jones v. Astrue*, 2007 WL 1017095, *3-4 (5th Cir. Mar. 29, 2007); *Higginbotham v. Barnhart*, 163 Fed. App'x 279, 281-82 (5th Cir. 2006)(*Higginbotham II*). Instead, the new evidence is to be considered along with all other evidence in the record to determine if it dilutes the record to the point that the ALJ's determination is insufficiently supported. *Higginbotham II*, 163 Fed. App'x at 282. *See also Browning v. Sullivan,* 958 F.2d 817, 823 (8th Cir. 1992).

When Findlay's opinion is reviewed in conjunction with the other evidence of record, substantial evidence remains to support the ALJ's decision. In fact, the ALJ relied on Carpenter's improvement while under Findlay's care and the relatively minimal objective findings documented in Findlay's progress reports as reasons to discount Carpenter's claims of disability. (Tr. 21). The ALJ further stated that he was giving Carpenter the benefit of the doubt and was being generous in limiting her to a modified range of light work. (Tr. 23). Conversely, Findlay did not cite any objective findings or even list a diagnosis in support of his own assessment of Carpenter's abilities. (Tr. 481-83). The Appeals Council found that Findlay's opinion provided no basis for disturbing the Commissioner's decision, and this court reaches the same conclusion.

2. Mental RFC

The ALJ found Carpenter needed to avoid extensive public contact and was limited to tasks at the lowest three levels of reasoning as defined in the Dictionary of Occupational Titles. Carpenter asserts that the ALJ's assessment of her mental residual functional capacity is unsupported by any medical source opinion addressing the effects that her mental impairment has on her ability to work, and she complains that the ALJ made an assessment based on his own lay interpretation of raw medical data.

The Fifth Circuit, in reviewing the ALJ's duty to fully and fairly develop the record, has held that the ALJ should usually request a medical source statement describing the types of work a claimant remains capable of performing. *Ripley v. Chater*, 67 F.3d 552, 557 (5th Cir. 1995). But the absence of such a statement does not, in and of itself, render the record incomplete. *Id.* When no such statement has been provided, the inquiry focuses on whether substantial evidence nonetheless is present in the existing record. *Id.* The court is to scrutinize the record as a whole in determining whether substantial evidence supports the administrative decision. *See generally Greenspan v. Shalala,* 38 F.3d 232, 240 (5th Cir.1994).

The state agency medical consultants found that Carpenter had no severe mental impairment, (Tr. 342), but the ALJ disagreed with that determination and found Carpenter's mental impairment was severe. The ALJ also reviewed Mallet's assessment of significant limitations in Carpenter's ability to perform work-related mental activities. He acknowledged that Mallet was a treating specialist and that her progress notes reflected that Carpenter had mental deficits, but found that the record did not support the degree of limitation that Mallet assessed. (Tr. 22). He also noted inconsistences in the record with relation to Carpenter's mental functioning, as illustrated during Wright's consultative evaluation in 2003, which yielded findings of no more than moderate impairment. The ALJ did not wholly reject the findings of either Mallet or Wright, but instead used both reports in assessing Carpenter as moderately restricted in her activities of daily living and social functioning, with moderate deficiencies in her concentration, persistence, or pace. (Tr. 22). In assessing Carpenter's residual functional capacity, the ALJ further limited her to tasks at the lower

levels of reasoning[11] and requiring no extensive public contact. (Tr. 23).

The ALJ is not required to give a treating source opinion controlling weight when there is contradictory evidence, and it is the ALJ's role to resolve conflicts in the evidence. *See Greenspan*, 38 F.3d at 237*; Jones v. Heckler*, 702 F.2d 616, 621 (5th Cir.1983). Substantial evidence supports the ALJ's assessment of Carpenter's RFC for work-related mental activities, and that assessment has not been shown to be a result of legal error.

## RECOMMENDATION

It is recommended that the decision of the Commissioner be affirmed.

## NOTICE OF RIGHT TO OBJECT TO PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATION AND CONSEQUENCES OF FAILURE TO OBJECT

Under 28 U.S.C. § 636(b)(1), each party to this action has the right to serve and file specific written objections in the United States District Court to the United States Magistrate Judge's proposed findings, conclusions and recommendation within ten (10) days after the party has been served with a copy of this document. The court is hereby extending the deadline within which to file specific written objections to the United States Magistrate Judge's proposed findings, conclusions and recommendation until September 4, 2007. The United States District Judge need only make a *de novo* determination of those portions of the United States Magistrate Judge's proposed findings, conclusions and recommendation to which specific objection is timely made. *See* 28 U.S.C. § 636(b)(1). Failure to file by the date stated above a specific written objection to a

---

[11] Carpenter complains that no treating or examining source defined the complexity of the tasks she can perform in terms of "reasoning levels" like those used in the ALJ's assessment of her mental RFC. RFC, however, is an administrative finding. 20 C.F.R. § 404.1546(c). Carpenter cites no authority suggesting that the ALJ's use of reasoning levels in his RFC assessment is improper, nor has she demonstrated that the ALJ's use of reasoning levels in her particular case was not a fair means of defining the simplicity or complexity of tasks she can perform.

proposed factual finding or legal conclusion will bar a party, except upon grounds of plain error or manifest injustice, from attacking on appeal any such proposed factual findings and legal conclusions accepted by the United States District Judge. *See Douglass v. United Services Auto Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996)(en banc).

## ORDER

Under 28 U.S.C. § 636, it is hereby ORDERED that each party is granted until September 4, 2007 to serve and file written objections to the United States Magistrate Judge's proposed findings, conclusions and recommendation. It is further ORDERED that if objections are filed and the opposing party chooses to file a response, the response shall be filed within seven (7) days of the filing date of the objections.

It is further ORDERED that the above-styled and numbered action, previously referred to the United States Magistrate Judge for findings, conclusions and recommendation, be and hereby is returned to the docket of the United States District Judge.

SIGNED AUGUST 13, 2007.

　　　　　　　　　　　　　　　/s/　Charles Bleil　　　　　　　　　　
　　　　　　　　　　　　　　CHARLES BLEIL
　　　　　　　　　　　　　　UNITED STATES MAGISTRATE JUDGE